Good morning. I'm Deputy Attorney General Jane Flynn representing the defendant prison officials in this case. And I too would like to thank the court and George Law School for giving us the opportunity to argue here today. And I would like your microphone just up just a hair up. Thank you. And I'm reserving four minutes for rebuttal this morning. Can everyone hear him? OK. Whatever time you have left on the clock will be yours. Thank you. This case arises from the temporary suspension of outdoor exercise following four assaults on officers during a two year period of recurrent and pervasive gang and racial violence at the California State Prison, Sacramento. The district court erred in allowing this case to proceed on damages because defendants were entitled to qualified immunity. It also erred in failing to instruct the jury that prison officials are entitled to deference in balancing their paramount interest in providing for institutional and safety and and the safety of inmates and staff when they when they balance that, that safety against an inmate's other right to outdoor exercise. And let me let me ask you before you get in the substance of the argument. I'd like to know a little bit about how the issue goes below. So I've got to stay in my mind. There was a bifurcation of liability and damages. The time was bifurcated. No, Your Honor, it was not. OK. So you said the district court should have not allowed the case to go on. Initially, defendants moved for summary judgment on qualified immunity grounds and lost and lost. Your Honor, that's correct. And you could have appealed and you did not. We chose not. Yes. Defendants chose not to appeal at that time, but reserve the right in the pretrial order. In fact, said that they were they were maintaining their contention that qualified immunity was owed to them. But at that stage, I took the district court's order. And if you disagree, I'd like to hear your views on that. To be that there were tribal issues of fact. That is that your interpretation? Not that not necessarily that you were not entitled at all, but that there were tribal issues of fact. I think that's what the district court was saying. I think the evidence at both the summary judgment phase and trial was essentially the same. Your Honor. But just generally speaking, if that's the basis of the district court's decision on summary judgment, then that's not something that could be appealed at that time, whether or not there are genuine issues of fact. Right. No. You could defendants could appeal if on the facts taken in the light most favorable. Right. But but not on the issue of whether it ought to go to trial or not. No, that's correct. You're right. But on the facts that were presented to the district court, the district court said two things on the summary judgment. It said, I'm not sure why these the exercise couldn't have been begun, say, one month earlier than it was. And two, why were the African-American inmates the last to be released during the last three lockdowns? Now, the evidence which was undisputed at that phase was that crip inmates had been the assailants in the last three assaults. And that all African-American inmates were locked down with them because the gangs pressured the non-affiliated inmates to do things for them during lockdowns. And what the court was really doing was saying, I'm not going to defer to the judgment, to the considered judgment of the prison officials in this setting. I don't really see that as a factual issue. It's a deference issue. And that definitely carried over. In any event, you didn't appeal. That's true. And just to get back to my question, how did the issue arise that you're now appealing? You said the district court shouldn't have let it go on to damages, but there was no bifurcation. So so had they granted qualified immunity, obviously there would have been no trial period on the damage. Had there been no lawsuit, we wouldn't be here. That's true. But that's on the task. I'm just wondering. So you get to trial. How is the how is the qualified immunity issue raised at trial? In the pre-trial order, defendants, the court's pre-trial order stated that defendants were renewing their contention that they were entitled to qualified immunity on the evidence to be presented. That was so the pre-trial order preserved the issue for trial. That's right. But how was it then raised by the state and by the defendants? I mean, at what point did you say, Your Honor, stop. We now are entitled to judgment because we now win on qualified immunity. At which point did that happen? And it was not raised in a motion at the trial. Wouldn't it have been larger? Wouldn't it have been logical for at the close of evidence to reach to say, well, we're requesting now that the court now that the court's heard all the evidence. Rule on qualified immunity and had the court granted qualified immunity at that time, then it wouldn't have gone to the punitive damages, correct? I think it would have been better had that been done. But I believe that. Well, I guess better and necessary might be two different questions. That's right, Your Honor. And so part of the appellate process is preserving error to come here. That's right, Your Honor. In the district court. That's correct, Your Honor. Well, I actually come to it from a slightly different direction. I think I get the same point as Judge Carahan. My question is, okay, the judge has now heard the evidence, which is what he preserved the issue for trial for. He says, you know, I want to hear the evidence.  At what point did you give him a chance to avoid error by ruling in your favor on qualified immunity after having heard the evidence? In which case did you say, Judge Grell, we've got the evidence and we win on qualified immunity, stop the trial, take the case away from the jury, we win. At what point did you do that? If you're asking, Your Honor, whether a Rule 50 motion was made, one was not made.     That's not a rule 50. That's not your previous argument. But why — how is this an argument properly before us? Well, a waiver — waiver was not argued in — by plaintiffs — by plaintiffs in the brief, Your Honor, so we did not address it. Well, you didn't address it. I'm not — I'm not asking anything. I've not given you a chance to address it because it's very much on my mind. Well, my answer is that the defendants believed they had preserved it through the statement in the pretrial order. How? I mean, if you're — if you are saying, look, we presented evidence at trial based on which we've established qualified immunity, what I normally get is a post-trial motion or sometimes a mid-trial oral motion or a — okay, I will now consider the evidence, make my own assessment. And now that I've heard the witnesses, I rule in your favor or against your qualified immunity. I would feel very bad if I reversed this district judge and he never had a chance to — on an issue that was never submitted to him for decision. I would — I would feel like I was — I wasn't really following the rules here. How do you help me out here? Your Honor, there — no motion was made. No motion was made. And why is this not waived? The only answer I have is that I believe trial counsel believed he had preserved it because of the statement in the pretrial order. So assuming — assuming there was a waiver, may I move to the next argument? Well, I think — I think that's a good segue to my next question, which would have to do with your claim of instructional error. My review of the record seems to indicate that you have — that there's a similar theme in terms of error preservation, that it is mentioned at the beginning of the trial that you're — that you do put the judge on notice that you're requesting some — an instruction that requires — includes deference. And the judge preliminarily rules against you. And then I think at the end of the trial, the record shows at EOR 1012 that just before closing arguments, when the district court asked for a final time whether parties had any problems with the jury instruction, counsel for the defendant stated defendants will not object to any of the instructions. They — there's a mention about mitigation, which is not the issue. That doesn't relate to deference. So once again, it's true. It was discussed earlier. But then at the end, a lot's happened between A and B. And counsel says, well, I won't object to any of the instructions. And counsel knows that you're not going to get the deference instruction. Have you preserved the error? Yes. And there's two answers to that question, Your Honor. First, under Rule 51, when the court ruled on the record that it was not going to give the request an instruction, defendants preserved their — their objection because the court ruled on the record that it was not going to give the request an instruction. And two, when defendants said they didn't object to the instructions that were given, all — all — all trial counsel was saying was that as far as those instructions went, they were correct. But that didn't mean that the — That takes a little — that takes a little mind reading. If I were teaching these students here today, would we tell them that you should say that to preserve your objection, or would you say — I mean, wouldn't it have been easy enough to say, well, we don't object to this, this, and this, but we still maintain our objection earlier that we proposed an instruction that included the definition of deference, and we, you know, we want that to — you know, the record to reflect that we continue to object? Counsel could have said that, Your Honor, but I don't think that Rule 51 required him to say it once there was a definitive ruling. It's actually a pretty fundamental question, because at the trial, lawyers often will present differing instructions, sometimes different wordings for the same instructions. And, you know, they prefer this wording, and others prefer this wording. But — and there's a good bit of that that goes on at the stage where those instructions are settled. But then it does not mean that everything that is rejected, if the court chooses one instruction over the other or chooses a third instruction, that the lawyer objects. The lawyer may think, look, I'd really love to get this out of the judge, you know, because it's more favorable to my side. But I recognize that it's — this rejection has broad discretion. And I — you know, I can't really raise an objection, because I — you know, I made my case, and I didn't get it. But if you are proposing a rule that says at any time a lawyer proposes an instruction, doesn't get exactly the same wording, exactly the wording that he proposes, that preserves an objection. That would be a pretty broad rule. Your Honor, he didn't get any of the wording he asked for. This is a critical instruction in these sorts of cases. If the court is going to apply deliberate indifference standard in this setting where there's massive violence and unrest going on in a prison, and a prison has a paramount obligation, all the cases say that, to protect the safety of staff and inmates, and they have to balance another right of outdoor exercise, it's critical that if you're going to apply the deliberate indifference standard that the jury be instructed that they have to balance that right and that they are — that the prison officials are entitled to deference if they can make a considered judgment how to do that. Why did the deliberate indifference standard come from anyway? I don't see it in any of our cases. Deliberate indifference has to do with medical care. No. Actually, it's been applied in other than medical care to conditions generally. Right. But this is not a medical case. It's not a medical case. And it's not. And for that reason, it's applied in medical cases because typically there are no competing concerns. It's almost like a hybrid here. If you're going to apply that standard — Well, the appellee says that that's your way of coming in the back door, trying to — you're saying deliberate indifference applies. But in order to get a deference instruction, they're saying that then it turns it into a Turner type of situation, when everyone agrees it doesn't apply. Right. And plaintiffs have said that throughout. And it's not Turner. And defendants cited Bell v. Wolfish or Jones v. North Carolina Prisoners Labor Union, which are the deference cases in safety situations. Those are the cases, not Turner. So the deference instruction applies any time you have this competing safety and other constitutional rights. Well, assuming that it was there, just for argument's sake right now, why should we reverse? Why was it not harmless there? Because it was prejudicial. Well, but why on these particular facts was it prejudicial? Because on these particular facts, if you look at the two other instructions, 9 and 11, on this subject, the balancing — you won't find the words balancing in there and you won't find deference. So the jury was left with the impression that it was free to substitute its judgment for what was the most reasonable way to manage the safety issues and the exercise issues. Well, let me go back just one small step. Assuming you've preserved the instructions, why was it error? Ms. Callahan asked about prejudice. But why was it error to fail to give this instruction? Which case do you have that says that deference, the jury must defer, must give deference? Bell versus Wolfish Jones versus North Carolina Prisoners Union. Any number of this court's cases I could talk about deference also. And there's a discussion, a recent case that I think Judge Thomas decided. Boulders, the city of San Francisco, where all three judges debated what deference, whether deference was being applied in the context of that search case. It's an essential element because it went the other way. With a with a concurrence and a dissent, a reluctant concurrence. It's an essential element because if the evidence is that prison officials considered their actions and the defendants, the excerpts of record volume two is replete with all the memos that discuss what they were doing. And they did not exaggerate. And certainly their responses to what was going on here was not exaggerated. Then neither a court nor a jury is entitled to second guess that judgment. And that's what happened here. But in the context of this trial, looking at the closing arguments, the state argued deference. It argued all of those things you're talking about. Actually, Your Honor, they argued the competing safety. They were not and did not argue deference. I mean, I searched for it. I couldn't find it. They did argue competing because the court said, I know, I know that say that deference is. So I know the safety. But the safety issue was was squarely presented to the jury in closing arguments. But if you remember, Your Honor, the judge said, I'd be shocked if a jury didn't know. Well, I don't know if a jury knows that you're supposed to weigh competing interest in deference. And then he wouldn't give the instruction basically claim the word deference was vague. Now, the dictionary says deference means yielding to the opinion or judgment of another. It's not an unusual word. And the courts have explained what it means. And they've also said that it means it has a high level of subjectivity. And it's not just looking back at what happened. But the lawyer in the trial court, why didn't they say I would have argued things? Well, you know, reasonable man. That sounds that's we use that all the time. You know, there's all sorts of words in the legal profession that and deference isn't. But you didn't make those arguments. And so the court deals with the arguments that you make. Your Honor, I don't think the court is free not to correctly instruct a jury on the law because an attorney doesn't give him everything he knows. Now, the court said it had read the cases. Not the Supreme Court cases. No, I know, which was unusual. It said it read the Ninth Circuit cases, but it had not read Bell or the other Supreme Court cases on deference. And then it said, I think this is vague. Well, you know, their cases, their Supreme Court cases on it. And having said, I know what I know what this means to then turn around and say it's vague and that you think the jury knows, but you think it's vague. There's a great confusion there. And I think that's demonstrated by the fact the jury came back during deliberations uncertain as to what deliberately indifferent men in this context. And I think they believed that they had the right to determine on their own what was more or less reasonable and to substitute their judgment for the prison officials. And that's why this was such a critical error in this case. And from there, you move to the punitive damages, which would which I believe were infected by the judicial by the error and the refusal to give deference. And which were in any event, we believe, excessive because there certainly was no egregious conduct on behalf of the prison officials here trying to protect the safety during this pervasive period of time. We don't have to assume that they were pervasive, which is a good thing. But they were pervasive, particularly as a result of the two strikes, which resulted in two serious attacks of gang violence at the prison and four serious attacks on staff, which almost resulted in death. Don't we have to assume reviewing the jury verdict? Don't we have to assume that the jury just didn't believe your clients when they said that they did it for safety reasons? No, you know, you don't have to. I mean, you're on it because in this situation, because the error may have been the result. You don't have to presume there are any factual findings there. That's the law where because the jury instruction may have pervaded their deliberations. I don't think you heard my question, partly because you cut in before I finished it. Don't we have to assume the jury did not believe your clients as to their motives? No. Listen to the question. Think about it. OK. Does this have any. Does it. Instruction that wasn't given have any bearing on the question of whether they believe your clients as to their motives. Deference or no deference. OK. I don't think the instruction. I don't think the instruction was given. Gave them any instruction on that. I asked you, do you. Don't we have to read the jury instruction as indicating the jury didn't believe your clients as to motive. So let's start there. What's your answer to that question? No, I don't think you have to do that, Your Honor. Why not? Well, I mean, you lost. Remember? No, that's true. OK. So as far as evidence that could be believed or not believed that helps your case, don't we have to assume the jury didn't believe it? Isn't that how we read jury verdicts? We look at all the evidence in the light favorable to the verdict. So if your client said we did it for safety reasons, we have to assume the jury said no, did it for predictive reasons. Well, isn't that the inference that we must draw from the jury's verdict? Well, it also that the instruction on delivering indifference also says that that that you had to conclude that the prison officials knew and believe they were going to cause harm by their by their actions. That's the instruction they were given. Yeah. But we have to assume that that's what the jury's verdict was, that there was no harm or damage found except one dollar in nominal damages for each of the events. I mean, there was no actual harm found. Was the eleven dollars for each defendant or. It was actually each defendant as to each of the role in each of the four suspensions. So it adds up adds up to eleven dollars. No compensatory damages because there was no harm, actual harm found. And then thirty nine thousand dollars in punitive damages. But to find punitive damages, the jury necessarily had to reject the argument that safety concerns justified. And the jury didn't have a logical inference from the verdict. Yes. And that they were free to substitute their judgment for their prison officials. Why do you say that? Because they weren't instructed that they know. I mean, they rejected the state's theory that safety and if they rejected the state's rationale, it seems to me it's pretty good argument that the error is harmless. If they had if they had believed your clients that safety concerns justified this, you would have won the case. No, I think when they came back and asked about delivering the difference, they were confused about whether they were free to substitute their belief as to what would have been a safe way to handle this for that of a prison official. Even if had you gotten the instruction on deference, that doesn't mean that the jury's job is over. I mean, it doesn't mean that they have to. Deference just means you have to get basically say that, well, they have some expertise in handling dangerous inmates and running prisons and doing all of that. But it's not. But it's sort of a rebuttable presumption. They could still think that the decision was not in. You know, at the end of the day, I think that they could reject it just like you can reject the testimony of an expert, couldn't they? They weren't instructed that effect, Your Honor. I know. But yes, getting the deference instruction wouldn't mean that you would win. No, that's true. Right. Had there been a deference instruction, the plaintiff would have had to show that what the prison officials did was one not considered, which the evidence didn't show, and two, that their response was exaggerated in the face of the of the danger they saw. And what seems to me your best argument is that it puts a different lens on the way the jurors would look at the case. Absolutely. And in terms of that they would then have to say, okay, the prison officials are entitled to deference in how they handle these things. Look at that first. And then they go to the next step. And the fact that they asked a question about deliberate meant that they were somehow struggling with, does it mean they did it on purpose or because they did do it on purpose, but they did it because they felt that it was in the best safety of the other inmates and the correctional officers. That's correct, Your Honor. That's what I would say your best argument is. How do we know they didn't do it for vindictive reasons? Pardon me, Your Honor. How do we know they didn't do it for vindictive reasons as a punitive measure? There's nothing in the record to reflect that. There's the jury verdict. There's no. I mean, there's a verdict. The jury heard the entire evidence. And they not only award damages, they award punitive damages. If they've been convinced of this, this, this was done for safety reasons, it's hard to imagine how they would have awarded them as much as punitive damages. Well, they weren't instructed on how to weigh safety versus outdoor exercise at all. I mean, the way the instruction read was that you have to provide outdoor exercise unless it's impossible, which I think is an unfortunate wording. There's always some possibility, I suppose, that you could have an officer walk with each each of the thousand inmates in the prison. You could provide for safety. But that's the way the instruction read. It had to be provided. It was important. And then the second instruction was on the deliberate indifference standard. And it did not mention anything about having to weigh these two competing interests at all. What's your best case that it's instructional error not to give a different difference instruction? Bell wasn't an instructional error case, nor those are statements of the law. I know they are. In fact, I was I don't think I've seen it. I was looking yesterday trying to find one. You're right. There is a recent April 2008 First Circuit case in which an instructional error appeal was made by a correctional official claiming that he was entitled to deference. And the court of appeals said, yes, yes, you are. As a matter of substantive law where it's prisons, prisoner, prisoner stuff. You're asking for a deference instruction on an employment decision. And it said it doesn't apply there. It would apply. And it cited Jones versus North Carolina and Bell. Those cases would apply to that. Sounds like Victor. Pardon me. Sounds like Victor. Did you say this? No, I didn't. I just looked at found it yesterday. But that's the only one. I mean, it seems to me that a deference where you're arguing is really more of a qualified immunity argument. I'm not an instructional error. Well, you know, it's both. I think in this case, we'll hear from a positive. Thank you. May it please the court. My name is Erin Haney. I'm a certified law student with the UC Davis Civil Rights Clinic, and I represent the appellee, Mr. Norwood. After a total of 12 months of depriving Mr. Norwood of outdoor exercise, defendants now demand the unfettered deference that this court rejected in Spain and Johnson v. Lewis for the following three reasons. Appellee respectfully requests that this court affirm the verdict. Spain was not a jurisdiction case. No, it wasn't. It was a it was an injunction case, if I remember. Yes, Your Honor. It was it had to do with outdoor exercise. It doesn't talk anything about defense or anything of that sort. That issue just didn't arise. No, Your Honor. However, the court determined that prison officials had to provide outdoor exercise under certain conditions to inmates. And so therefore, it's not really clear what we said. What we decide this case was sort of like a advance. This case is good for this. This case is really good for the day only. Isn't that what they say? That's probably what Judge Kennedy. They do state that we do not consider it necessary to decide. Unless they decide whether the probation of the exercise is a personal violation. And then it's not. And the cases that came after Spain, though, like Allen and Tucson, the Yankee relied on the fact that Spain said that outdoor exercise could constitute an Eighth Amendment violation. Not that it necessarily is a per se. They say it could. I mean, you know, it's one thing to say, look, if you don't get some exercise for years and years. But three months at a time, five months at a time. This question is not as highly novel. A lot of people would be happy if they were told they didn't have to exercise. Yes, Your Honor. However, as the court discussed in Spain, the conditions there made it essential for inmates to have outdoor exercise in order for them to survive emotionally. Where does that come from? Where does that come from? Lots of people don't get exercise at all. I mean, never exercise. Yes, Your Honor. You know, they sit in front of the television, sit on the couch and they live for years and years and years. Yes, Your Honor. Justice Anthony Kennedy in Spain discussed the expert opinions that being locked down in certain conditions where you don't have access to other programs, where you are in this state of fear because of the violence in the prison, that outdoor exercise is essential for inmates to maintain physical and psychological well-being. And so Spain was dealing with what happens in those conditions. Why don't we give them visits to amusement parks? That would help, too. I mean, I sort of don't get it. I mean, prison is not supposed to be fun or particularly good for you. I mean, we send people to prison to punish them. I am. Yes, Your Honor. I just wonder where this constitutional right comes from. We clearly send people to prison to punish them. However, as the court. For no other reason. Well, this is a partial motive. We send them there for for their health and to punish them. We send them only to punish them. That's the only purpose of prison serve. Right. Well, it is called the California Department of Corrections and Rehabilitation. So ideally, we would also be rehabilitating inmates while we're there, while they're there. But, yes, some of some of the motive is to punish. Nonetheless, there are certain guidelines, certain protections of the Eighth Amendment that remain within the prison walls. And having having outdoor exercise at least every five months is part of it. Yes, Your Honor. Having the right to have a minimal ability to exercise, to get out of the cell, to get out of those cramped conditions, as was discussed in Spain, is necessary for the emotional emotional and physical well-being of the inmates. Well, it does appear to be undisputed in this case that there were a number of incidents and they were violent incidents and people were hurt. And I looked in your brief and would it be a fair reading of your brief, particularly on pages 25 and 26, to argue that prison officials were entitled to some deference and that the instruction is given allowed the jury to do so. I mean, you seem to you don't seem to be of the position that everyone knows how to run a prison as well as prison officials. So I see a slight concession on your part that they would be entitled to some deference on some decisions. Is that correct? Yes, Your Honor, which is why the instruction included times during which outdoor exercise may in fact be suspended. So this wasn't a case in which we were simply arguing you can never suspend outdoor exercise for any reason. We looked to the situations in which prison officials are permitted to suspend outdoor exercise and that was given to the jury. And some of the citizens are deciding this case. And most I will tell you, I mean, I lived in a courtroom for a long time. And you do in fact have more trial work than a lot of people ever have because some people never have one jury trial. So you're above many. But I've had a few more than you as far as that goes. And those 12 jurors don't know what happens in prison like prison officials do. They don't know, you know, the type of uprisings they have. They don't, they aren't, those 12 jurors don't have to worry. They don't know how clever inmates can be, how they can get things in, you know, how they don't have to worry about being attacked. It seems to me that they, you know, that everyone, and even Judge Burrell said, well, everyone knows that the prison's entitled to some deference in how they run the prison, yet the instruction wasn't given. Isn't that an admission that that's an important point in the process? An important point in the process is that there's this violence in the prison and that prison officials are dealing with that violence. And that came out of the mouths of the defendants repeatedly throughout the trial. But there was no law given to the defendants to argue any force of it. Yes, they argued that safety was all of that. But without that instruction, the jurors didn't know what to do with it. And they asked a question, what does deliberate mean? You know, why doesn't that mean that this error was prejudicial? It completely changes your analysis and the lens that you would look to the case. Your Honor, the instruction that was given to the jury held as one of the circumstances during which outdoor exercise could be suspended as unusual circumstances. So something that was unusual in the prison meant that prison officials could suspend outdoor exercise. Prison officials had the right to do that and that they were to essentially defer to the prison officials if they found Where's the word deference? There is not the word deference, but the use of the term unusual circumstances, which is quite a broad category, allowed the jury to, if it chose to decide the facts in favor of the defendants, to fit it into that category. Further, the instruction that was proposed by the defendants was the heightened Whitley deference standard, which is given in cases where decisions are made in a time of haste, where there's no time for reflection, there aren't meetings during which they can determine what they should do, but instead they have to act immediately. And here there was repeated testimony that the prison officials met over and over again, sometimes twice a week. Let me ask you, though. So you, it would be your, you agree that the officials are entitled to some deference. I agree that prison officials can suspend outdoor exercise in certain times. Are they entitled to any deference? Yes, Your Honor. Okay. And there is no, the word deference isn't anywhere in there. No, Your Honor. But you're saying the instructions that were given implicitly would allow the jurors to know that. Yes, Your Honor. And given the instruction that they propose is an instruction used in times when decisions are made without any benefit of reflection. So what's wrong with giving the instruction, letting the jury sort that out? I mean, you can argue to the jury that they had plenty of time, that the prisoners had plenty of time to make this, that this instruction is not applicable to this case. But by not getting instruction, you deprive the state of its theory, it seems to me. I mean, its theory was, look, we had to make these decisions. Safety was at issue. That's our theory of the case. And by not giving the instruction, I mean, there's a pretty good argument that the state was deprived of having the jury consider its theory on the merits. Now, you could have argued, obviously, that, oh, as you have today, that this doesn't apply. What's wrong with giving the instruction? Your Honor, nowhere in the instruction that they propose was there this requirement of decisions being made in haste. So essentially what they wanted was this kind of unfettered deference to prison officials without any qualification that this is given in situations where there's no time for reflection. Further, defendants were on notice that such an instruction wasn't going to be given as they failed to object to it at three critical junctures during the trial. Therefore ‑‑ But, you know, if it's the law, okay, you won the battle and got a more favorable playing field, but then you put yourself at risk in losing the war because this is the war here. So if, in fact, that was like Judge Thomas said, if, in fact, that was the law, why not give the jurors the law and give them the benefit of it, and then you don't have to defend this right here? Your Honor, the law is that when there's no time for reflection, this instruction must be given. However, this Court in Johnson v. Lewis held that as soon as that time period ends, as soon as there's time for reflection, there's time for meetings, there's a way in which to control the environment, that deliberate indifference instead of the heightened Whitley deference standard is what governs. So in Johnson v. Lewis, for example, where there was a prison riot and inmates were handcuffed and then taken outside, this Court held that as soon as they were handcuffed, that is when the heightened Whitley deference standard ended and deliberate indifference governed. Well, in this case, we're not challenging the immediate initial lockdowns. Instead, what's being challenged are the extended deprivations of outdoor exercise, where there was much testimony was heard about how much reflection was given to locking down these inmates and depriving them of outdoor exercise. So, therefore, it would be deliberate indifference and not the Whitley deference standard that did govern. Okay. I'd like to ask you about qualified immunity. Yes, ma'am. And we discussed a little bit. You've got the two prongs on qualified immunity. I'm not sure Judge Kosinski is going to give you that you have a violation on the first. But let's assume that exercise, that it can establish the constitutional violation. My concern is on the second prong. What case or cases do you think put the defendants on clear notice that they were violating your client's rights, constitutional rights, by not reinstating access to outdoor activity more promptly? The cases are kind of all over the map. And so, to me, if that's the case, then even though they might have violated the rights, they win because it wasn't clearly established. What cases make it clearly established? Yes, Your Honor. The cases that make it clearly established are Spain, Allen, and Tucson, the Yawkey. And the defendant's contention is that there's a distinction between those cases and the one at hand because those cases dealt with administrative segregation. Yet, in this case, much of the testimony had to do with detailing the conditions during this lockdown. The conditions here mirrored those of it. Well, ADCEG is different. Ask anyone that's been in it. They're in the cell all by themselves for, what, 11 hours out of the day. You know, they. Yes, Your Honor. ADCEG is different precisely because of the conditions that occur there, not simply because of the label. And here, given that most of the same conditions were occurring during this general population lockdown and that the opinion in Spain had taken the time to really go through and explain why it was those specific conditions, not just the label of administrative segregation that mandated outdoor exercise, certainly then when a wholesale block begins to mirror the conditions in administrative segregation. Well, do we have a Ninth Circuit case that gives us a bright line on inmate deprivation of outdoor activity? Can you cite me a Ninth Circuit case? Spain, 30 years ago, was the case that established an inmate's right to outdoor exercise. And since then, there has been Allen v. Sakai and Toussaint v. Yockey. Further, the administrative segregation distinction, the issue that these lockdowns were occurring in the general population as opposed to in administrative segregation, also draws the pool of law too narrowly. As you stated, it needs to put defendants on notice, on fair notice, that what they're doing is unlawful. And here again, since the conditions were essentially identical to those in administrative segregation, 30 years ago, the decision was that these conditions mandate outdoor exercise for inmates within a reasonable period of time. Further, defendants- You keep saying that the conditions here were the same as in administrative segregation. Why don't you list what some of those are? Mr. Honor, long periods of time in the cell without being able to get out, suspension of what would otherwise be considered normal programming, no telephone calls, no visitation. It's actually- it's listed in the court's record at 124 and in defendants- Were they in solitary cells? No, they were not in solitary cells. This is a big one that you skipped over. It is- that is the distinction between- that is probably the one distinction between the general population lockdowns and administrative segregation. However, the reasoning given in Spain that mandated outdoor exercise under certain conditions had to do with living in this kind of chaotic fear and apprehension. And one could certainly argue that that's even more true when you're cramped in a cell with more people as opposed to simply by yourself. I see that my time is almost up. While security concerns in a prison are essentially endless, and the jury heard quite a bit about this, the way in which we manage, or in this case, the way in which we punish inmates for those concerns are not equally limitless. They are constrained and informed by the Eighth Amendment. And here, the court has required for now 30 years that this minimal requirement of outdoor exercise be provided to inmates under these conditions. It does seem a little strange that prison officials are faced with a potential riot, will be under the threat of damages and punitive damages if they make the judgment the wrong way. You know, a jury of eight people later disagrees with the decision as to whether to hold a facility in lockdown for three months as opposed to two months, as opposed to one month as opposed to two to five months. I mean, we have a series of very serious incidents in in a max. This is a maximum security facility, right? It's pretty serious. These are not what I call penny anti-criminals. And your client's convicted of what, two counts of murder, first and second degree, serving life without possibility of parole.  He's also been a model inmate and was uninvolved in any of these assaults. So he is serving his time there. But he is not entirely a model. I mean, he has a disciplinary record. He has slight disciplinary infractions, but none of what you hold up as a model. But I would take a model as somebody who hasn't done it, which your client does have repeated violations of the disciplinary rules. Your Honor, that wasn't an issue in this case. But my understanding is, yes, that he had some. You made an issue in this case by saying what a model he was. You know, if you if you you know, once you open the door, counsel, you know, you. Yes, Your Honor. I understand he had some minor violations about being out of bounds in some areas. Nothing violent. I would say he wasn't a model citizen before he went there either. So that's not the model doesn't really kind of describe him in any capacity. Yes, Your Honor. It really seems very strange to have prison officials running the facility at the risk of their of damages and punitive damages, because eight people later disagree with whether they allowed exercise. So three months later, two months later, it seems like a very strange decision. Yes, Your Honor. But the very, very strange way to run a prison system. The issue here was that the jury found that, in fact, the inmates weren't locked down for security concerns. They were instead locked down for punishment. Had the jury believed the defendants that this was due to security concerns? How do you derive that from the jury verdict? I'm sorry? How do you derive that from the jury verdict? Because the jury found that that the defendants were deliberately indifferent. And then with the award of punitive damages, they found that there was a reckless or callous indifference or an evil motive. And here the testimony of the defendants themselves supported that in that they claimed they were locking down for security concerns, yet the only time they locked down were when there were. You know, I know this is a standard applied. Where does this standard come from? None of our cases that I see talk about deliberate indifference. Spain doesn't. Ireland doesn't. Deliberate indifference to what? It's deliberate indifference to the risk to the health and safety of the inmates. But we know they suffered no damage. We know they suffered no damage. So maybe they took a risk for their health. But in the end, they suffered no damage. How can you have a violation here? Your Honor, the jury found that Mr. Norwood suffered no compensable damage. But coupled with that, the language of the instruction for compensatory damages was also the PLRA language, which stated that they couldn't compensate him for an emotional injury unless he had a physical injury that was more than minor or de minimis. So it's not exactly clear whether they found that he had no compensable injury. But wouldn't the lens be different? You said that what they found, the callousness, what they found for the punitive damages, if the jury had known that they were entitled to deference, wouldn't that have made a difference in the calculus of whether they were being callous or punitive in what they were doing? No, Your Honor. I mean, it says, you know, I mean, you have expertise. You're entitled to some deference. Your Honor, it wouldn't have made a difference given that the jury found that the defendants were being callous.    So the question is, if the jury had known that the defendants were being callous, would it have suggested this for punitive reasons, not merely for security concerns, but instead to punish inmates? Had this been just a question of whether these were security concerns, which has come up in other cases, then perhaps it would have been different. But in the case at hand, the issue was, in fact, whether this was done for security concerns or whether this was done to punish inmates. Well, let's say it was done to punish inmates. So what? I'm, you know, if it didn't result in any damage to their health, I don't understand what the problem is. Yes, Your Honor. Well, again, it's not clear that it did. I assume that's what we can infer from the jury's verdict, that the prison officials were really angry at the inmates for calling them on these problems. And they said, well, let's keep them locked up for another month or two and teach them a lesson, make sure they don't, you know, they realize it and try it again. We'll, you know, everybody will suffer. So let's say they do that. So what? Your Honor, I want to make sure I understand. Assuming that the jury's... Assuming we read the jury's verdict as having found that kind of intent on their part. That kind of intent and no compensable damage. Right, no compensable damage. Your Honor, even so, there are certain fundamental constitutional protections that state officials cannot punish people in ways that risk this type of harm. So even though the jury may not have found that this type of harm... Even if the harm doesn't come to pass? Yes, Your Honor. Even if the jury found that this particular injury wasn't compensable, perhaps for the PLRA language or perhaps for another reason, still prison officials cannot risk this type of... The injury that could have occurred, given what we know about outdoor exercise and why inmates are required to it. Assuming if they transport prisoners without seatbelts and the bus gets to the other side, to the other place, and nobody's injured, there is no accident. They can sue and they say, well, if the bus had been in an accident, we could have been injured because they didn't put seatbelts on us. Every time they do something and nothing happens, prisoners can go back and say, oh, but something could have happened? No, Your Honor. Is that the theory? No, Your Honor, but certainly... We have a lot of lawsuits, then. No, Your Honor, but certainly if prison officials are engaging in behavior for punishment that carries that risk, it's a different situation than if, as you said, prison officials may be transporting an inmate without a seatbelt. So if that's done for punishment, if that's done while knowing the risk that could befall that inmate and to punish them for a security concern, then that would be outside the bounds of the Eighth Amendment, as it would be deliberately risking that. Thank you. Thank you. We've used up more than your time. We'll give you a minute for a bottle if you choose to take it, remembering that cases are often lost on the bottle. Thank you, Your Honor. Very briefly... You know, no lawyer has told us that the many has ever taken the hint, including those who lost on the bottle. But go ahead. With that warning, Your Honor, I will risk slipping my toes into the river. As to the qualified immunity question, there are numerous cases, unpublished cases of the Ninth Circuit, which can be referred to unqualified immunity. There are many recent cases involving similar lockdowns. We cited them in our brief. Spain, Allen, Tucson are not those kind of cases. Those are long-term. Spain, it was four years of long-term indeterminate disciplinary detention. So those cases don't apply. Plaintiffs have not cited a single case that the law in this circuit is clearly... Allen didn't involve more than three weeks, if I remember correctly. It was very short. So what do you do with Allen? Well, the law is just simply not clearly established in this area, Your Honor. And we are not arguing... And Whitley does not say that deference only applies in the Whitley case. If you look at the North Carolina Prisoner Union case, that was a labor union case in prison. It's not... Deference is not only in the riot situation. Whitley deals with the immediate situation. In fact, Whitley says the deference applies not only to the initial imposition of this, of a lockdown, it's the prophylactic measures taken to prevent a recurrence, which the court's cases have said indicates a lot of subjective judgments on the part of prison officials. Okay. With that, Your Honor, thank you. All right. Thank you. The case is now yours. Pass it on.
judges: Kozinski, Thomas, Callahan